***********
This matter was reviewed by the Full Commission based upon the record of the proceedings before Deputy Commissioner Bost, along with the briefs and arguments on appeal. Accordingly, the Full Commission REVERSES in part and AFFIRMS in part the Deputy Commissioner's holding and enters the following Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered by the parties at the hearing as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the North Carolina Industrial Commission has jurisdiction of the parties and of the subject matter.
2. The parties are subject to and bound by the North Carolina Workers' Compensation Act.
3. R. J. Reynolds was a qualified self-insured employer, administered by Kemper Insurance under the terms and provisions of the Act.
4. The employee-employer relationship existed between the plaintiff and the defendant-employer at the time of the alleged injury.
5. The plaintiff's average weekly wage was $645.00 as of 4 March 1996 and $666.00 as of 7 May 1997.
6. The defendant-employer paid plaintiff $6,966 in salary continuation benefits for the alleged 4 March 1996 injury and $16,420 for the alleged 7 May 1997 injury and, beginning the week of 7 December 1997, defendant-employer paid plaintiff $359.93 per week continuing to the present in long term disability benefits.
The Pre-Trial Stipulations dated April 19, 1998 and May 13, 1999 submitted by the parties at the hearing are incorporated by reference.
In addition, the parties stipulated into evidence the following:
"Medical records concerning right arm" 24 pages
"Medical records concerning left arm" 12 pages
"Physical therapy records" 9 pages
"RJR Medical Records" Pages 1-11
"Winston-Salem Health Care Records 1984-87" Pages 12-20
"Winston-Salem Health Care Records 1990-97" Pages 21-67
"Proceedings leading to hearing in claim" 9 pages
and the following exhibits were offered into evidence by plaintiff:
Employment history (6/25/98) Ex. P-1
Job evaluations (6/25/98) Ex. P-2
Job description (6/25/98) Ex. P-3
Defendants' Answers to Interrogatories (6/25/98) Ex. P-5
Defendants' Answers to Second Interrogatories (6/25/98) Ex. P-6
Industrial Commission proceedings leading to May 13 hearing Ex. I
Additional medical records from Dr. O'Keeffe (5/13/99) and Ex. II
defendants offered the following exhibits into evidence:
Video of plaintiff's job (6/25/98) Ex. D-1
Surveillance video by Scott Pope Investigations (6/25/98) Ex. D-2
 Resume of Alan C. Gorrod, Triad Therapy Services, Inc. (5/13/99) Ex. I-1
Ergonomic Job Analysis (5/13/99) Ex. I-2
 ***********
Based upon the evidence of record, the Full Commission enters the following:
 FINDINGS OF FACT
1. Plaintiff worked at R.J. Reynolds Tobacco Company ("Reynolds") as a General Plant Attendant since 1975 performing various jobs including forklift driver and general laborer. In March 1991, plaintiff was injured in a compensable accident while driving a forklift that resulted in a torn right rotator cuff requiring surgical repair. Plaintiff was given a 15% PPD rating to the right shoulder. Reynolds paid the PPD rating and plaintiff was released to return to work, albeit at a less strenuous job. Plaintiff returned to work in September 1991 as a General Plant Attendant, a position where he could limit his lifting to below the waist level and use his whole body to pull; this job change was pursuant to the recommendations of plaintiff's treating physician, Dr. Lowe.
2. Beginning in 1995, plaintiff worked as a General Plant Attendant on the Second Floor of the Product Reclamation Operations Facility ("PRO Facility"). Plaintiff's job at the PRO Facility consisted of removing paper from reclaimed tobacco moving across parallel bars and general cleaning. The specific job tasks included removing loose cigarette paper from a sieve, using fingers to pick up lengths of cigarette paper with one worker positioned on each side of a vibrating sieve. This task was performed on non-continuous basis with the employees rotating sides, and could be done by using either hand. Plaintiff also used a push broom intermittently and a compressed air hose with a wand extension to blow off residue tobacco film from machines. Cleaning the machines was done one to two times per week, one to two hours at a time, and was self-paced. Part of plaintiff's job was to move 4 foot by 4 foot deep "cans" or carts of loose cigarette packs to the auto dump of the agitator/sieve conveyor. This was performed intermittently when the cans became full. The cans, although weighing up to 700 pounds, were on wheels and moved easily across a level concrete floor, using total body force.
3. Beginning in December, 1996, plaintiff was instructed to clean his work area due to a recent bug infestation. The areas plaintiff was instructed to clean included areas above his head. Plaintiff repetitively had to use an air hose to complete this task.
Plaintiff suffered a recurrent right rotator cuff tear caused by this overhead work.
Plaintiff's work in reaching with an air hose repetitively to clean his work area put him at an increased risk as compared to the general public to suffer from recurrent right rotator cuff tear and bilateral rotator cuff tendonitis.
6. On 4 March 1996, plaintiff had to push tobacco cans weighing about 500 pounds out of his way in order to get to his work area. This was not part of his normal and usual work activity. As plaintiff was pushing one can out of the way, it accidentally hit another can and jerked plaintiff's left arm, causing severe pain, and a bulge or knot to form in his upper arm or biceps tendon area. This accident caused plaintiff to suffer a rupture or the long head of the biceps tendon.
7. Later on 4 March 1996, while plaintiff was working at the vibrating sieve, he mentioned to his supervisor, Rita Kilgore that he thought he might have hurt his left arm moving a can and showed her a knot in his left arm. Ms. Kilgore sent plaintiff to the RJR Medical Department where Dr. Bonfili, the Director of the Medical Department, examined him. Plaintiff told Dr. Bonfili that he noticed a tingling and swelling in his left upper arm while at work. Plaintiff was diagnosed with a ruptured left bicep and referred to Winston-Salem Health Care ("WSHC"), the HMO for Reynolds' employees, for treatment.
8. As a result of the 4 March 1996 compensable accident, plaintiff was unable to earn wages in the same or in any other employment during the period 4 March 1996 through 29 May 1996. His average weekly wage as of 4 March 1996 was $645.38, yielding a compensation rate of $430.27.
9. WSHC treated plaintiff conservatively and referred him to Dr. Tomberlin, an orthopedic surgeon, for a second opinion. Dr. Tomberlin felt that surgical repair would not likely be satisfactory, but recommended that plaintiff build the brahalsis muscle in his left arm to substitute for the strength and gave him instructions as how to do that.
10. Plaintiff was out of work from 6 March 1996 to 29 May 1996 due to the left arm injury. During that time period, he was compensated one hundred percent of his usual salary through a salary continuation ("SC") benefit provided by his employer. Plaintiff was not given a PPD rating or work restrictions from the injury. Plaintiff returned to work at his same job as General Plant Attendant at the PRO Facility.
11. On 7 May 1997, plaintiff went to the office of the supervisor of the PRO Facility, Diana Vestal, and told her that he felt that he was unable to do his job as General Plant Attendant. Ms. Vestal called RJR Medical Department and spoke to Jesse Holmes, R.N., regarding any medical restrictions that plaintiff might have on his ability to work as a General Plant Attendant. Jesse Holmes advised Ms. Vestal that plaintiff did not have any work restrictions in his medical records. Plaintiff was sent to RJR Medical Department for an examination and released from work by Jesse Holmes based on his reports of shoulder pain.
12. Plaintiff then began treatment with Dr. O'Keeffe for his shoulder pain. He was initially diagnosed with shoulder tendonitis on 19 May 1997, by Dr. O'Keeffe's Physician's Assistant ("PA"), Suzonne Stratton. Plaintiff was written out of work and continued to treat regularly with Dr. O'Keeffe. On 14 August 1997, Dr. O'Keeffe diagnosed him with a torn right rotator cuff and surgery was recommended. Plaintiff had a surgical repair of the torn right rotator cuff on 10 September 1997. Although plaintiff recovered well after the surgery, he continued to have discomfort about both shoulders and, consequently, was diagnosed with "diffuse rotator cuff tendonitis" by Dr. O'Keeffe on 18 May 1998. Plaintiff was unable to work due to this condition beginning 19 May 1998 and continuing.
13. Plaintiff continued to treat with Dr. O'Keeffe until 13 November 1998 when Dr. O'Keeffe concluded plaintiff was at MMI and gave him a "15% permanent partial impairment of the right shoulder secondary to the rotator cuff tear and a 5% permanent partial impairment of the left shoulder secondary to chronic rotator cuff tendonitis." Dr. O'Keeffe did not indicate whether the 15% PPD to the right arm took into account the identical 1991 rating which had been issued to plaintiff by his partner, Dr. Stephen Lowe.
14. Dr. Bonfili certified in a letter to the carrier that plaintiff was eligible for long term disability benefits for the two to three months that it would take to recover from shoulder surgery. Plaintiff never returned to work.
15. Defendant is entitled to a credit for the payments it made to plaintiff for plaintiff's 4 March 1996 compensable injury in the stipulated amount of $6,966.00 pursuant to its salary continuation plan.
 ***********
Based upon the foregoing findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
1. Plaintiff's acquisition and aggravation of his recurrent right rotator cuff tear and bilateral rotator cuff tendonitis was due to causes and conditions characteristic of and peculiar to his employment with defendant-employer, is not an ordinary disease of life to which the general public not so employed is equally exposed, and is, therefore, an occupational disease. N.C. Gen. Stat. § 97-53(13).
2. On 4 March 1996, plaintiff was not performing his regular duties in the usual and customary manner when the ruptured left biceps injury occurred, thus plaintiff sustained an injury by accident to his left biceps arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
3. As a result of his compensable injury by accident on March 4, 1996, plaintiff is entitled to compensation for total disability from 4 March 1996 through 29 May 1996 at the rate of $430.27 per week. N.C. Gen. Stat. § 97-29.
4. As a result of his recurrent right rotator cuff tear and bilateral rotator cuff tendonitis, plaintiff is entitled to compensation for total disability at the rate of $430.27 per week from 19 May 1997 and continuing until plaintiff returns to work or until further order of the Commission. N.C. Gen. Stat. § 97-29.
5. The plaintiff is entitled to have the defendant pay for medical expenses incurred or to be incurred as a result of the compensable injury of 4 March 1996 and as a result of the recurrent right rotator cuff tear and bilateral rotator cuff tendonitis as may be required to provide relief, effect a cure or lessen the period of disability. N.C. Gen. Stat. § 97-25.
6. Defendant is entitled to a credit for the payments it made to plaintiff for plaintiff's 4 March 1996 compensable injury in the stipulated amount of $6966.00 pursuant to its salary continuation plan. N.C. Gen. Stat. § 97-42.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, the defendant shall pay temporary total disability compensation to the plaintiff for plaintiff's torn biceps tendon at the rate of $430.27 per week for the period from 4 March 1996 through 29 May 1996. Defendants, however, are entitled to a credit for the amount of salary continuation it paid in the amount of $6966.00. As much of said compensation as has accrued shall be paid in a lump sum.
2. For his contraction of the occupational diseases recurrent right rotator cuff tear and bilateral rotator cuff tendonitis, subject to a reasonable attorney's fee herein approved, defendants shall pay total disability compensation at the rate of $430.27 per week from 19 May 1997 and continuing until plaintiff returns to work or until further order of the Commission. As much of said compensation as has accrued shall be paid in a lump sum. This amount is also subject to the credit mentioned above.
3. Defendant shall pay medical expenses incurred or to be incurred for plaintiff's plaintiff's torn biceps tendon as well as his recurrent right rotator cuff tear and bilateral rotator cuff tendonitis as may be required to provide relief, effect a cure or lessen plaintiff's period of disability.
4. A reasonable attorney's fee of twenty-five percent of the compensation awarded to plaintiff in paragraphs 1 and 2 of this AWARD is hereby approved for plaintiff's counsel and shall be paid as follows: twenty-five percent of the lump sums due plaintiff shall be deducted from those sums and paid directly to plaintiff's counsel. Thereafter, every fourth check shall be paid directly to plaintiff's counsel.
5. Defendants shall pay the costs of this appeal.
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER
CONCURRING:
 S/______________ RENE C. RIGGSBEE COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER